# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| JOHN BUSSIAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:04CV00387 |
| | ) | |
| DAIMLERCHRYSLER CORPORATION, | ) | |
| DAIMLERCHRYSLER AG, | ) | |
| DAIMLERCHRYSLER MOTORS | ) | |
| COMPANY OF DELAWARE, LLC, and | ) | |
| DAIMLERCHRYSLER NORTH | ) | |
| AMERICA HOLDING CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter comes before the Court on (1) the motion of Defendants DaimlerChrysler

Corporation, DaimlerChrysler Motors Company of Delaware, LLC, and DaimlerChrysler

North America Holding Corporation[1] (collectively "DaimlerChrysler") to dismiss Plaintiff

John Bussian's Second Amended Class Action Complaint (Pleading No. 33)[2]; (2) a motion

to intervene by Pamela and Jeffrey Davis, Cynthia T. Compton, and Lisa Mann Pannell

(Pleading No. 24); (3) a motion to intervene by Catherine R. Snow and Tammy Stanley

(Pleading No. 37); and (4) a motion to intervene by Clyde and Brenda Freeman (Pleading No.

---

[1] DaimlerChrysler AG is a German holding company and has not been served with process in this matter.

[2] The Court notes that DaimlerChrysler's first motion to dismiss, Pleading No. 2, is directed to Plaintiff's first amended complaint and is moot.

54). All of the pending motions have been fully briefed and, on July 13, 2005, the Court heard the oral argument of counsel. The motions are ready for a ruling.

## I. Procedural History

Plaintiff filed this class action lawsuit in the Superior Court for Durham County, North Carolina, seeking to represent a class of individuals in the United States, except within the State of Wisconsin, who owned or leased model year 1998 through 2003 Dodge Durango sport utility vehicles. The proposed class expressly excluded any individuals with claims against DaimlerChrysler for personal injuries. The complaint alleged that these Dodge Durango vehicles are "inherently defective in that the control arm and the ball joint[3] on the front suspension design are faulty, inferior, and prone to sudden failure." (Pleading No. 1, Defs.' Notice of Removal, Ex. A, Class Action Compl. ¶ 2.) The complaint contained three counts: (1) breach of express warranties; (2) breach of the implied warranty of merchantability; and (3) violation of the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301 *et seq.*[4]

On May 3, 2004, Defendants removed the case to this Court, and on May 10, 2004, 2004, filed a motion to dismiss under Rule 12(b)(6). On September 1, 2004, Plaintiff filed a motion for class certification and a motion for leave to file a second amended complaint.

---

[3] Ball joints are part of the steering and suspension system in Durangos and other vehicles. The ball joints, connected to control arms, allow the wheels to turn and the system to absorb bumps without breaking.

[4] On April 5, 2004, Plaintiff filed a First Amended Class Action Complaint, which made changes that are not material to a determination of the instant motions.

-2-

Pursuant to a Consent Scheduling Order entered on November 10, 2004, the Court permitted Plaintiff to file a second amended complaint and delayed Defendants' obligation to respond to Plaintiff's motion for class certification until after the Court had ruled on Defendants' motion to dismiss.

The Second Amended Class Action Complaint reduced the scope of the class from nationwide (excepting Wisconsin residents) to North Carolina residents only, and added a fourth count against Defendants alleging violation of North Carolina's Unfair or Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. § 75-1.1 *et seq.* Following the filing of Plaintiff's Second Amended Class Action Complaint, Defendants filed a renewed motion to dismiss under Rule 12(b)(6).

## II. Factual Allegations of Plaintiff's Second Amended Class Action Complaint

Between 1998 and 2003, DaimlerChrysler manufactured the Dodge Durango sport utility vehicle ("SUV") and sold between 450,000 and 886,000 to the public. (Pleading No. 29, Second Am. Class Action Compl. (hereinafter "Compl.") ¶¶ 1, 22, 23, 29.) In May 2001, Plaintiff John Bussian, a resident of Durham County, North Carolina, purchased a used 1998 Dodge Durango. *Id.* ¶¶ 9, 44. DaimlerChrysler had issued a 3-year/36,000 mile express written warranty to cover the 1998 Durango. *Id.* ¶¶ 25, 35. However, at the time of Plaintiff's purchase, the three-year express warranty on his Durango had expired. *Id.* ¶¶ 44-46, 56-64.

-3-

At some point after his purchase of the 1998 Durango, Plaintiff took the vehicle to a mechanic for an inspection. The mechanic allegedly informed Plaintiff that his ball joints had worn out prematurely and that failing to replace them would constitute a safety hazard. *Id*. ¶ 45. Plaintiff Bussian paid the mechanic $700.00 to replace the ball joints in his Durango. *Id*. ¶ 46. Plaintiff alleges that after he became aware that many other Durango owners had experienced the same problem with ball joints, he requested that DaimlerChrysler reimburse him for the cost of repair. DaimlerChrysler refused to do so. *Id*. ¶ 47.

Plaintiff alleges that because the ball joints in Durangos cannot be re-lubricated, and the lubrication already inside the ball joints is "prone to deteriorate," the ball joints degrade or wear out rapidly. *Id*. ¶ 27. Ball joint failure can result in separation of the front wheels, collapse of the front suspension, or total loss of vehicle control. *Id*. ¶¶ 27, 38. Plaintiff alleges that ball joints are designed to, and ordinarily do, function for periods of time and mileages substantially in excess of those specified in DaimlerChrysler's warranties. *Id*. ¶ 28.

Plaintiff maintains that DaimlerChrysler became aware of the ball joints' propensity to wear out prematurely through (1) their own records of customer complaints regarding the ball joints; (2) over 20,000 warranty claims relating to premature ball joint failure; (3) over 850 reports of ball joint failure to the National Highway Traffic Safety Administration ("NHTSA"); (4) an investigation by the NHTSA into the ball joints in Dodge Durangos; (5) various reports in the press concerning failure of the Durango's ball joints; (6) a class action lawsuit in Wisconsin regarding the Durango's ball joints; and (7) requests for action from

-4-

consumer safety groups concerning the ball joints. *Id.* ¶¶ 30, 41. Plaintiff alleges that despite this knowledge that the ball joints were "inherently defective and prone to sudden failure," *see id.* ¶ 41, DaimlerChrysler refused to notify the public of the safety defect, issue a recall of affected vehicles, or reimburse owners for the replacement costs. *Id.* ¶¶ 30, 63, 68, 76-78, 83, 85, 88. Instead, Plaintiff alleges that DaimlerChrysler represented to the public that the ball joints had a projected design life of 10 years/150,000 miles, and that their "[i]mproved sealing assures durability equal to or greater than that provided by ball joints that require periodic lubrication." *Id.* ¶¶ 21, 87-88. Plaintiff alleges that Defendants made additional representations and warranties regarding the Durango on the website www.dodge.com:

> Dodge power . . . and long-lasting capability is what the 2003 Durango is all about.
>
> Feeling secure in your vehicle is one of the most important purchase decisions you make. You can always count on Durango to get you through the tough situations . . ..

*Id.* ¶ 24.

Plaintiff alleges that in addition to the costs of ball joint repair, which vary from $600 to $1,200, he and other prospective class members have been damaged in that their Durangos are "dangerous and hazardous to drive, resulting in loss of use, . . . and substantially diminished value, including, without limitation, diminished resale value." *Id.* ¶¶ 39-40. Plaintiff also alleges that prospective class members have suffered peripheral damage to tires, tie-rod ends, and other parts of the steering and suspension systems due to defective ball joints. *Id.* ¶ 91. Plaintiff, on behalf of himself and other members of the prospective class,

-5-

demands a jury trial, compensatory, incidental and consequential damages, treble damages under the UDTPA, equitable relief under the MMWA, the establishment of a common fund, attorney's fees, interest and costs. *Id.* ¶¶ 64, 70, Prayer for Relief.

## III. Discussion

Defendants move to dismiss Plaintiff's second amended complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted. A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the complaint. *Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994), *cert. denied*, 514 U.S. 1107 (1995). Accordingly, such motions "should be granted only in very limited circumstances." *Rogers v. Jefferson-Pilot Life Ins. Co.*, 883 F.2d 324, 325 (4th Cir. 1989). When considering a motion to dismiss, the plaintiff's allegations must be taken as true. *Revene v. Charles County Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989). Therefore, a motion to dismiss under Rule 12(b)(6) should be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *DeSole v. United States*, 947 F.2d 1169, 1177 (4th Cir. 1991)(quoting *Coakley & Williams, Inc. v. Shatterproof Glass Corp.*, 706 F.2d 456, 457 (4th Cir. 1983)).

## A. Breach of Express Warranties (Count I)

Although the express 3-year/36,000-mile warranty on Plaintiff's Durango had expired at the time he replaced his ball joints, Plaintiff argues that the durational limitation on the express warranty is "unconscionable" under section 25-2-302 of the North Carolina General

-6-

Statutes.  In addition, Plaintiff maintains that several statements in Defendants' advertising materials regarding the overall quality of Durangos and the durability of the ball joints constitute additional express warranties which formed a basis of the bargain when he purchased his Durango.  Plaintiff alleges that Defendants breached these express warranties by selling him a Durango equipped with defective ball joints and by refusing to reimburse him for the cost of replacing his ball joints.  (Compl. ¶¶ 56-64.)

In support of the instant motion to dismiss, Defendants argue that Plaintiff's claim for breach of express warranties fails to state a claim because (1) the statements made in advertising materials upon which Plaintiff relies constitute mere sales puffery and do not create express warranties under North Carolina law; (2) Defendants have no duty to disclose to Plaintiff that the ball joints in his Durango might fail after expiration of the express warranty, citing *Abraham v. Volkswagen of America, Inc.*, 795 F.2d 238, 250 (2d Cir. 1986); and (3) the 3-year/36,000-mile limitation in the express warranty is not "unconscionable." The Court will address each of these contentions in turn.

1.    Representations in Advertising Materials

In his complaint, Plaintiff points to the following statements by Defendants in advertising materials that he maintains created express warranties upon which he relied when he purchased his Durango:

- Upper ball joints are permanently lubricated and maintenance-free. Improved sealing assures durability equal to or greater than that provided by ball joints that require periodic lubrication. (Compl. ¶ 21.)

-7-

- Ball joints have "a projected design life of 10 years/150,000 miles." *Id.* ¶¶ 87-88.

- Dodge power, innovation and long-lasting capability is what the 2003 Durango is all about. From its best-in-class torque, to its best-in-class towing, to [its] best-in-class seating, to its best-in-class 7/70 standard powertrain warranty, Durango will gladly tackle whatever you put it through for years to come.

    . . .

- Best-in-class towing isn't something to take lightly. With the kind of power generated from Durango's strong Magnum engines and the no-holds-barred toughness of the frame, this SUV can tow plenty.

    . . .

- Feeling secure in your vehicle is one of the most important purchase decisions you make. You can always count on Durango to get you through the tough situations and of course, to never break down in the beginning of a horror movie. *Id.* ¶ 24.

Plaintiff alleges that these statements are "clear affirmations of fact that . . . go well beyond anything that might be considered [sales] 'puffery'" and constitute express warranties. (Pleading No. 42, Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss at 10.) Plaintiff further emphasizes that "whether 'an affirmation creates an express warranty or is merely the seller's opinion or puffing is ordinarily a question of fact for the jury,'" citing *Triple E, Inc. v. Hendrix & Dail, Inc.*, 543 S.E.2d 245, 247 (S.C. Ct. App. 2001). *Id.* at 11.

While the question is close, the Court concludes that at this early stage of the proceedings, Plaintiff has alleged sufficient facts to state a claim of breach of express

-8-

warranties based on Defendants' representations in advertisements. Section 25-2-313 of the

North Carolina General Statutes defines express warranties as follows:

> Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain . . ..
>
> . . .
>
> It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

N.C. Gen. Stat. § 25-2-313 (2005). In light of this definition, the Court doubts that many of

the alleged representations regarding the qualities of the Durango in general, i.e., "strong,"

"tough," "long-lasting," and "secure," rise to the level of "affirmations of fact" that could

create express warranties under North Carolina law. However, Plaintiff's allegations that

Defendants represented the ball joints to have a "projected design life of 10 years/150,000

miles," to be "maintenance-free," and to have a "durability equal to or greater to that

provided by ball joints requiring periodic lubrication," are, in the Court's view, sufficient at

the pleadings stage to state a cognizable claim regarding express warranties. The North

Carolina courts have recognized that section 25-2-313's distinction between binding

"affirmations of fact" and non-binding opinions or commendations of the goods is "hazy."

*See Hall v. T.L. Kemp Jewelry, Inc.*, 71 N.C. App. 101, 322 S.E.2d 7 (1984). However, the

issue of whether a seller's representations amount to an express warranty is ordinarily a

question of fact. *See Pake v. Byrd*, 55 N.C. App. 551, 286 S.E.2d 588 (1982); N.C. Gen.

-9-

Stat. § 25-2-313, cmt. 3; *Solarz v. DaimlerChrysler Corp.*, No. 2033, 2002 WL 452218, at *11 n.7 (Pa. Ct. Comm. Pl. Mar. 13, 2002)(unpublished opinion)(plaintiffs' allegations that DaimlerChrysler created express warranties through their advertisements and internet statements not proper for resolution at pleadings stage).

Defendants argue that Plaintiff's complaint does not adequately plead reliance on Defendants' representations in advertisements, and that reliance is a critical element of an express warranty claim, citing *Hollenbeck v. Ramset Fasteners, Inc.*, 267 N.C. 401, 403, 148 S.E.2d 287, 289 (1966)("[A] seller is bound by an express warranty when, and only when, it is made to induce a sale and does induce such sale.") The Court recognizes that Plaintiff alleged that Defendants made the representations regarding the ball joints "[u]pon information and belief" and did not provide any further facts regarding Plaintiff's personal knowledge of the representations. (Compl. ¶ 21.) However, elsewhere in his complaint, Plaintiff alleged that he "reasonably relied on Defendants' representations and warranties regarding the quality, durability, and other material characteristics" of his Durango, and that those representations "became a basis of the bargain" between Defendants and Plaintiff. *Id.* ¶¶ 36, 59. A higher level of specificity is not required of Plaintiff at the pleadings stage. *See* N.C. Gen. Stat. § 25-2-313, cmt. 3 ("no particular reliance on such statements need be shown . . . ."); *Bernick v. Jurden*, 306 N.C. 435, 448, 293 S.E.2d 405, 413-14 (1982); *Kinlaw v. Long Mfg. N.C., Inc.*, 298 N.C. 494, 501 n.7, 259 S.E.2d 552, 557 n.7 (1979)(reliance need not always be expressly alleged and "can often be inferred from allegations of mere purchase if

-10-

the natural tendency of the representations made . . . is to induce such purchase . . ..")
Plaintiff should have an opportunity to develop the issue of reliance through discovery.

    2.    A Duty to Disclose Defects Under the *Abraham* Decision

    Contrary to Defendants' position, the Court does not find any ground for denying
relief to Plaintiff on the basis of the *Abraham* decision. *Abraham* stands for the broad, nearly
universally accepted proposition that a latent vehicle defect known to the manufacturer at the
time of sale that does not manifest itself until after expiration of the express warranty does
not, in and of itself, give rise to a breach of express warranty claim. *Abraham*, 795 F.2d 238,
240; *Carlson v. Gen. Motors Corp.*, 883 F.2d 287, 294-95 (4th Cir. 1989); *Mazerolle v.
DaimlerChrysler Corp.*, No. CV-01-581, 2002 WL 31367215, at *3 (Me. Sup. Ct. Sept. 20,
2002)(unpublished opinion); *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604,
616 (3d Cir. 1995); *Canal Elec. Co. v. Westinghouse Elec. Corp.*, 973 F.2d 988, 992-93 (1st
Cir. 1992). Here, Plaintiff has framed his express warranty claim in the more narrow theory
that the durational limitation in his Durango's express warranty is *unconscionable*, an issue
which was not addressed in *Abraham*. *See Mazerolle*, 2002 WL 31367215, at *3-4
(following *Abraham* and disallowing express warranty claim on the basis of latent defects,
but allowing claim that durational limitation in express warranty is unconscionable). The
Court will now turn its attention to the issue of unconscionability.

3. <u>Unconscionability</u>

Plaintiff argues that Defendants' "superior knowledge" of the latent ball joint defect, combined with the "colossal unequal bargaining power" between a consumer such as Plaintiff and an automobile manufacturer such as DaimlerChrysler has "time and again" resulted in a finding that durational limitations on warranties are unconscionable, citing the Fourth Circuit's *Carlson* decision. (Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss at 14.) Plaintiff relies on *Carlson* for the further argument that "unconscionability claims should but rarely be determined on the bare-bones pleadings." *Carlson*, 883 F.2d at 292. Plaintiff maintains that while section 25-2-302 makes clear that the issue of unconscionability is a question of law for the court to decide, Plaintiff should be allowed a "reasonable opportunity to present evidence as to [the warranty's] commercial setting, purpose and effect to aid the court in making the determination," *see* N.C. Gen. Stat. § 25-2-302, which can only occur after an opportunity for discovery.

In response, Defendants maintain that *Carlson* is inapposite because it involved the interpretation of South Carolina law and dealt with a durational limitation on the implied warranty of merchantability and not an express warranty. Defendants argue that while section 2308 of the MMWA requires that implied warranties be "conscionable," express warranties need only be "reasonable," and Plaintiff has made no allegations that the 3-year/36,000-mile express warranty for his Durango is not "reasonable."

-12-

Defendants' argument overlooks the role that state law principles of unconscionability play in actions under the MMWA. While it is true that the MMWA does not require that express warranties be "conscionable," the Court notes that the MMWA was intended to provide federal *minimum* standards for warranties and was not intended to preempt state rights and remedies. *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1013-14 (D.C. Cir. 1986)(It is "beyond genuine dispute that, as to both implied and written warranties, Congress intended the application of state law, except as expressly modified by Magnuson-Moss, in . . . breach of warranty actions.") Plaintiff did not plead unconscionability under section 2308 of the MMWA. Rather, Plaintiff alleges that the durational limitation in his Durango's express warranty is unconscionable under N.C. Gen. Stat. § 25-2-302. *See* Compl. ¶ 62. Section 25-2-302 provides as follows:

> (1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contact, . . . or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

> (2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination.

N.C. Gen. Stat. § 25-2-302 (2005). Therefore, the fact that the MMWA does not require that express warranties be conscionable is no bar to Plaintiff's argument of unconscionability under North Carolina law. *See Mazerolle,* 2002 WL 31367215, at *4 (citing *Carlson* and

-13-

denying motion to dismiss on plaintiff's claim that durational limitation in *express* warranty was unconscionable under state law).

Applying section 25-2-302 to the allegations in Plaintiff's complaint, the Court concludes that Plaintiff has sufficiently pled unconscionability to state a claim for breach of express warranties. In his complaint, Plaintiff specifically alleges that the limits of the express warranty are unconscionable because the Durangos "contain a latent defect of which Defendants were actually or constructively aware at the time of sale, and purchasers lacked a meaningful choice with respect to the terms of the warranty due to unequal bargaining power and a lack of warranty competition." (Compl. ¶ 62.) The Fourth Circuit in *Carlson* has expressly recognized that such allegations are sufficient to withstand a motion to dismiss under Rule 12(b)(6):

> [P]roof that GM knew of and failed to disclose major, inherent product defects would obviously suggest that its imposition of the challenged "durational limitations" on implied warranties constituted "overreaching," and that the disclaimers themselves were therefore "unconscionable." . . . That is in large measure what the plaintiffs here have claimed; and we therefore cannot say that their amended complaint failed to allege facts which, if proven to the court's satisfaction, could establish that, as a matter of law, GM's durational limitations on the operation of implied warranties were indeed unconscionable.

883 F.2d at 296. The Court also agrees with *Carlson* that the issue of unconscionability should rarely be determined without an opportunity to develop evidence of time, place and commercial setting. For the reasons set forth above, the Court **RECOMMENDS** that Defendants' motion to dismiss Plaintiff's breach of express warranties claim be denied.

-14-

**B.      Breach of Implied Warranty of Merchantability (Count II)**

Defendants argue that Plaintiff's breach of implied warranty of merchantability claim fails as a matter of law for several reasons: (1) the warranty had expired at the time Plaintiff replaced his ball joints; (2) there was no privity of contract between Plaintiff and Defendants; and (3) Plaintiff's complaint fails to allege lack of merchantability.   In response, Plaintiff argues that (1) the durational limitation of the implied warranty of merchantability is ineffective because it was not "conspicuous" or "conscionable"; (2) North Carolina does not require privity of contract in warranty actions against automobile manufacturers; and (3) Plaintiff has adequately pled that his Durango was not merchantable.

To maintain a claim for breach of the implied warranty of merchantability, Plaintiff must allege that his Durango was not "fit for the ordinary purposes for which such goods are used." N.C. Gen. Stat. § 25-2-314 (2005); *Carlson*, 883 F.2d at 297; *Maybank v. S.S. Kresge Co.*, 46 N.C. App. 687, 691-92, 266 S.E.2d 409, 411-12 (1980).   In the context of automobiles, courts have held that the "ordinary purpose" of an automobile is to provide transportation.   Where an automobile provides safe, reliable transportation, it is generally considered merchantable. *Carlson*, 883 F.2d at 297-98; *Taterka v. Ford Motor Co.*, 86 Wis.2d 140, 146, 271 N.W.2d 653, 655 (1978); *In re Air Bag Prods. Liability Litigation*, 7 F. Supp. 2d 792, 803 (E.D. La. 1998).   The implied warranty of merchantability does not "impose a general requirement that goods precisely fulfill the expectations of the buyer. Instead, it provides for a minimum level of quality." *Skelton v. Gen. Motors Corp.*, 500

-15-

F. Supp. 1181, 1191 (1980).   In addition, Plaintiff must show that his Durango was unmerchantable *at the time of sale*.  *Maybank*, 46 N.C. App. at 691, 692, 266 S.E.2d at 411, 412.

Applying these standards to the instant case, the Court concludes that Plaintiff's complaint fails to make a legally sufficient allegation that his Durango was not merchantable.[5]  According to the complaint, Plaintiff was informed by his mechanic in 2003 that the ball joints in his used 1998 Durango needed replacing.  (Compl. ¶ 45.)  Between the time that Plaintiff purchased his Durango *used* in May 2001, and the unspecified time in 2003 when he replaced his ball joints, Plaintiff makes no allegation that the allegedly defective ball joints caused him to suffer mechanical problems, lose control of his vehicle, or have an accident.  Plaintiff does not allege that his Durango was ever rendered inoperable by the defective ball joints.  Plaintiff makes no allegation that he lost faith in his Durango or stopped driving his Durango after he learned of his ball joint problem.  Thus, with the exception of a single repair five years after original manufacture, Plaintiff's complaint makes out no allegations that his Durango was not fit for the purposes for which it was intended, i.e., to provide safe and reliable transportation.  *See Priebe v. Autobarn, Ltd.*, 240 F.3d 584, 588 (7th Cir. 2001)(despite plaintiff's allegations that he "lost faith" in his vehicle, fact that he continued to drive vehicle and had driven it more than 30,000 total miles, negated

_____

[5]  Because the Court finds that Plaintiff has not sufficiently alleged that his Durango was not merchantable, the Court need not and does not reach Defendants' other arguments regarding the implied warranty of merchantability.

merchantability claim); *In re Air Bag Prods. Liability Litigation*, 7 F. Supp. 2d at 803 & n.17 (fact that vehicle's air bags *may* cause serious injury does not suggest that the vehicles "have not served the ordinary purpose of transportation"); *Lee v. Gen. Motors Corp.*, 950 F. Supp. 170, 174 (S.D. Miss. 1996)(no merchantability claim where vehicles had been driven for five years and 90,000 miles without manifesting their alleged defects); *Taterka,* 86 Wis.2d at 147, 271 N.W.2d at 655 (same - 33 months and 75,000 miles); *Ford Motor Co. v. Fairley*, 398 So.2d 216, 219 (Miss. 1981)(same - 2 years and 26,649 miles).

Plaintiff's argument that *United States v. Gen. Motors Corp.*, 561 F.2d 923 (D.C. Cir. 1977) supports his position is unavailing.  In that case, the court was reviewing (1) a determination by the NHTSA that a steering defect created an "unreasonable risk of accidents"; and (2) an order by the NHTSA requiring General Motors to notify vehicle owners of the defect.  The court did not have before it a claim for breach of the implied warranty of merchantability.  The standard for what constitutes an "unreasonable risk of accidents" under the National Traffic and Motor Vehicle Safety Act of 1966, 15 U.S.C. § 1381 *et seq.*, and the standard for "merchantability" under section 25-2-314 of the North Carolina General Statutes are completely different, and an analysis under one standard provides no support for an analysis under the other.

Plaintiff cites *Reid v. Eckerds Drugs, Inc.*, 40 N.C. App. 476, 253 S.E.2d 344 (1979) for the proposition that Defendants in this case additionally breached the implied warranty of merchantability by failing to warn consumers of the "dangerous propensities" of the

-17-

Durango's ball joints. The Court notes that the *Reid* case involved the adequacy of a warning label on an aerosol can of deodorant and arose out of specific language in section 25-2-314 of the North Carolina General Statutes: "Goods to be merchantable must be at least such as . . . are adequately contained, packaged and labeled as the agreement may require; and . . . conform to the promises or affirmations of fact made on the container or label if any." Here, Plaintiff makes no claim that any warning labels on his Durango were inadequate, and thus, the *Reid* case is inapposite.

Because Plaintiff's complaint fails to adequately plead that his Durango was not merchantable, the Court **RECOMMENDS** that Defendants' motion to dismiss Plaintiff's claim of breach of the implied warranty of merchantability be granted.

## C.    Magnuson-Moss Warranty Act Claim (Count III)

In Count III of his complaint, Plaintiff claims entitlement to damages for breach of both express and implied warranties under the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301 *et seq.* The parties agree that claims under the MMWA are subject to the same pleading requirements and defenses as the state law warranty claims set forth in Counts I and II because Magnuson-Moss warranty claims derive from state law. *Walsh v. Ford Motor Co.*, 807 F.2d at 1013-14 ("[W]e think it beyond genuine dispute that, as to both implied and written warranties, Congress intended the application of state law.") Thus, it is clear that because Plaintiff's claim for breach of the implied warranty of merchantability fails under state law, it must also fail under the MMWA. In addition, the Court notes that, as

-18-

discussed above regarding Plaintiff's express warranty claim, under section 2308 of the MMWA, express warranties need only be "reasonable" – there is no requirement that they also be "conscionable." *See Carlson*, 883 F.2d at 295 ("[T]he crucial distinction is that drawn by the express terms of § 2308 between the 'reasonableness' of limitations on express warranties and the 'conscionability' of accompanying limitations on *implied* warranties.")(emphasis in original). As such, the Court **RECOMMENDS** that Plaintiff's claim for breach of express warranties under the MMWA also be dismissed for failure to state a claim.

### D.     Unfair or Deceptive Trade Practices Act Claim (Count IV)

In count IV of his complaint, Plaintiff alleges that despite Defendants' "superior knowledge of . . . the Durango's extreme ball joint failure rate, . . . the warning signs of ball joint failure, and . . . the serious consequences of . . . ball joint failure," Defendants failed to warn consumers of the ball joint defect and continued to promote ball joints as "lifetime" components that were "maintenance-free" with a "projected design life of 10 years/150,000 miles" and "durability equal to or greater than that provided by ball joints requiring periodic maintenance." (Compl. ¶¶ 85, 87.) Plaintiff contends that these practices constitute unfair or deceptive trade practices in violation of the North Carolina Unfair or Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. § 75-1.1 *et seq.*

Defendants argue that Plaintiff's claim under the UDTPA must be dismissed because (1) there is no privity of contract between Plaintiff and Defendants, citing *Prince v. Wright*,

141 N.C. App. 262, 268, 541 S.E.2d 191, 196 (2000) and *Wilson v. Wilson*, 121 N.C. App. 662, 665, 468 S.E.2d 495, 497 (1996); and (2) there is nothing unfair or deceptive about Defendants' failure to inform Plaintiff that he might need to pay $700 for a repair to a five-year-old vehicle.

On review, the Court finds that Plaintiff's unfair or deceptive trade practices claim should be dismissed pursuant to the "economic loss rule." North Carolina has adopted North Carolina's "economic loss rule" which prohibits the purchaser of a defective product from using tort law to recover purely economic losses. *Moore v. Coachmen Indus., Inc.*, 129 N.C. App. 389, 401-02, 499 S.E.2d 772, 780 (1998); *Coker v. DaimlerChrysler Corp.*, No. 01CVS1264, 2004 WL 32676, at *3 (N.C. Super. Ct. Jan. 5, 2004)(unpublished opinion), *aff'd*, ___ N.C. App. ___, 617 S.E.2d 306 (2005). "The rationale for the economic loss rule is that the sale of goods is accomplished by contact and the parties are free to include, or exclude, provisions as to the parties' respective rights and remedies, should the product prove to be defective." *Moore*, 129 N.C. App. at 401-02, 499 S.E.2d at 780. However, "[w]here a defective product causes damage to property other than the product itself, losses attributable to the defective product are recoverable in tort rather than contract." *Id.* As this Court has recently recognized, "tort concepts of safety and risk apply when a manufacturer negligently produces products that are dangerous to people or other property, and the manufacturer is responsible for injuries caused by his negligence. However, this rationale does not apply where a manufacturer's products simply fail to 'meet the business needs of

-20-

his customers.'" *Indemnity Ins. Co. of N. Amer. v. Amer. Eurocopter LLC*, No. 1:03CV949, 2005 WL 1610653, at *10 (M.D.N.C. July 8, 2005)(Beaty, J.)(citing *2000 Watermark Ass'n, Inc. v. Celotex Corp.*, 784 F.2d 1183, 1186 (4th Cir. 1986)); *see also East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 872 (1986)(The need for a remedy in tort is reduced when the only injury is to the product itself and "the product has not met the customer's expectations, or . . . the customer has received 'insufficient product value.'")

In the recent, and very similar, case of *Coker v. DaimlerChrysler Corp.*, the North Carolina Business Court extended the economic loss rule to claims of common law fraud and unfair or deceptive trade practices under N.C. Gen. Stat. § 75-1.1 *et seq.* In *Coker*, the plaintiffs claimed that minivans manufactured by DaimlerChrysler were defective because they lacked a brake-shift interlock system, which prevents a person from shifting an automobile with an automatic transmission from park into reverse or drive unless they depress the brake pedal. 2004 WL 32676, at *1. The plaintiffs did not allege that they had actually unintentionally shifted the transmissions of their minivans from park into reverse or drive, or that they had suffered personal injuries or damage to property other than their minivans because of the defect. Like the instant case, the plaintiffs alleged only that they had "suffered an economic loss because the minivans have a lower value without the interlock system." *Id.* at *3. In applying the economic loss rule to bar the fraud and unfair trade practices claims, the court reasoned as follows:

> [A]warding the damages sought by plaintiff would violate the policy
> foundation of the economic loss rule by eviscerating the contract/warranty

-21-

system now in place. . . . The unfair trade practice claim is based upon the same theories of liability and damages as the common law fraud claim. To permit recovery for this claim . . . would also eviscerate the contract/warranty system and the economic loss rule.

*Id.* at *3 & n.3.[6]

The same reasoning was applied by the Third Circuit in *Werwinski v. Ford Motor Co.*, 286 F.3d 661 (3d Cir. 2002). In *Werwinski*, the plaintiffs had brought a putative class action against Ford Motor Company for breach of warranties, fraudulent concealment, and unfair trade practices based on two allegedly defective components in the transmissions of certain Ford vehicles. *Id.* at 663. The district court found that Pennsylvania's economic loss rule barred the plaintiff's claims for fraudulent concealment and unfair trade practices, and the Third Circuit affirmed, reasoning that because the plaintiffs' claims "relate to 'the quality or character of the goods sold,' the claims clearly are 'intertwined' with . . . their breach of warranty claims." *Id.* at 678 (quoting *Huron Tool & Eng. Co. v. Precision Consulting Servs., Inc.*, 209 Mich. App. 365, 532 N.W.2d 541, 545 (1995)); *see also Cooper Power Sys., Inc. v. Union Carbide Chem. & Plastics Co., Inc.*, 123 F.3d 675, 682 (7th Cir. 1997)("Misrepresentations . . . that ultimately concern the quality of the products sold[] are properly remedied through claims for breach of warranty."); *Weather Shield Mfg., Inc. v. PPG Indus., Inc.*, No. 97-C-707-S, 1998 WL 469913, at * (W.D. Wis. June 11, 1998)

---

[6] On appeal, the North Carolina Court of Appeals did not reach the Business Court's finding on the economic loss rule because it affirmed the Business Court's decision on other grounds. *Coker v. DaimlerChrysler Corp.*, ___ N.C. App. ___, 617 S.E.2d 306, 314 (2005).

(unpublished opinion)("Exempting [statutory fraud] claims from the . . . economic loss doctrine would virtually nullify the doctrine since . . . claims arising from product failure can readily be recast as misrepresentation claims."); *Flagg Energy Dev. Corp. v. Gen. Motors Corp.*, 244 Conn. 126, 153-54, 709 A.2d 1075, 1088 (1998)(economic loss rule barred plaintiff's claims of unfair trade practices because the claims "depend[ed] upon the allegations of fact that [we]re identical to those asserted in their [contract] claims").

The Court is cognizant that there is authority to the contrary. *See Delgado v. J.W. Courtesy Pontiac GMC-Truck, Inc.*, 693 So.2d 602, 609 (Fl. Ct. App. 1997)(holding that Florida's unfair trade practices act is not affected by the economic loss rule); *Coker v. DaimlerChrysler Corp.*, 617 S.E.2d at 318-19 (dissenting opinion of Hudson, J.). And, as recognized by the dissenting opinion in the Court of Appeals' *Coker* decision, the North Carolina appellate courts have not yet decided whether to extend the economic loss rule to claims based on frauds or unfair trade practices. *Id.* at 318. However, this Court is careful to note that it is not finding, nor could it find, that the economic loss rule bars all claims of unfair trade practices that allege only economic losses. *See id.* (noting numerous North Carolina cases allowing purely economic recovery in unfair trade practices claims). The Court limits its decision to cases such as the instant case involving allegations of a defective product where the only damage alleged is damage to the product itself and the allegations of unfair trade practices are intertwined with the breach of contract or warranty claims. The Court finds that in such a setting, *Coker*, *Werwinski*, *Weather Shield*, *Flagg Energy*, and

-23-

*Cooper Power* are the better-reasoned cases, and the Court will follow them here in **RECOMMENDING** that Plaintiff's claim for unfair or deceptive trade practices be dismissed pursuant to the economic loss rule.

## E.     Primary Jurisdiction

Defendants argue that, under the "primary jurisdiction" doctrine, the Court should decline to exercise jurisdiction over this action and defer to the NHTSA's investigation of alleged defects in the ball joints of 1998-2003 Dodge Durangos.  The doctrine of "primary jurisdiction" is a court-created doctrine that "is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." *Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 303 (1976)(quoting *United States v. Western Pac. R. Co.*, 352 U.S. 59, 63 (1956)).  Although "[n]o fixed formula exists for applying the doctrine," *id.* at 64, courts will consider whether (1) the case involves a matter within the special expertise of the agency; and (2) there is a need to promote uniformity in administrative policy or a possibility of inconsistent results between the courts and the agency.  *Far East Conf. v. United States*, 342 U.S. 570 (1952); *Texas & Pac. R. Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426 (1907).

Here, Defendants argue that Plaintiff's claims involve the resolution of issues that are within the specific competency and expertise of the NHTSA.  Defendants contend that investigating, and where necessary, ordering and supervising a remedy such as a recall for a motor vehicle safety defect is "one of the principal reasons that the NHTSA exists."

(Pleading No. 43, Defs.' Mem. in Supp. of Mot. to Dismiss at 19.) In addition, Defendants

maintain that the need for consistent rulings and uniform safety standards also warrants

application of the primary jurisdiction doctrine, and that actions taken by the Court in this

case may conflict with the NHTSA's "ongoing" investigation. *Id.* at 23.

At the outset, the Court notes that at the time Defendants submitted their brief in

support of their motion to dismiss, the investigation of the NHTSA into the Durango's ball

joints was indeed still "ongoing." However, the Court takes judicial notice[7] of the fact that

on February 10, 2005, the NHTSA issued findings with regard to its investigation of the

Durango's ball joints, concluding that a safety defect in fact exists with regard to 2000-2003

four-wheel drive Durangos. *See* Nat'l Highway Traffic Safety Admin., *Engineering Analysis*

*Closing Report*, Feb. 11, 2005 at 32 (available at http://www-odi.nhtsa.dot.gov/cars/

problems/recalls/recallsearch.cfm). With regard to 2000-2003 two-wheel drive Durangos

and all 1998-1999 Durangos, the NHTSA found as follows:

> Because of the low rates of separation incidents in the remaining subject
> vehicles, a safety-related defect has not been identified in those populations
> and further use of agency resources does not appear to be warranted. The
> closing of this investigation does not constitute a finding by NHTSA that no
> safety-related defect exists in those vehicles. The agency reserves the right to
> take further action if warranted by the circumstances.

---

[7] A Court may take judicial notice of public records when considering a motion to
dismiss under Rule 12(b)(6). *Int'l Coalition for Religious Freedom v. Maryland*, No. 00-
1541, 3 Fed. Appx. 46, 52 & n.7 (4th Cir. Feb. 7, 2001)(unpublished opinion)(citing *Cinel
v. Connick*, 15 F.3d 1338, 1343 & n.6 (5th Cir. 1994)).

*Id*. In addition, the Court takes judicial notice of the fact that, prior to the NHTSA's issuance of its findings, on December 15, 2004, DaimlerChrysler announced a voluntary recall of all 2000-2003 four-wheel drive Durangos to effect repairs of the defective ball joints, which recall is currently underway. Letter from Stephan J. Speth, Director of Vehicle Compliance & Safety Affairs for DaimlerChrysler to Ronald L. Medford, Senior Associate Administrator of Vehicle Safety with the NHTSA, Dec. 15, 2004 (available at http://www-odi.nhtsa.dot. gov/cars/problems/recalls/recallsearch.cfm). Pursuant to this recall, DaimlerChrysler agreed to reimburse affected owners who had already paid to have ball joints replaced. *Id.*

In light of the foregoing developments, the Court finds persuasive grounds for applying the doctrine of primary jurisdiction in regard to the NHTSA's findings of a safety defect in the ball joints of 2000 to 2003 model year, four-wheel drive Dodge Durangos. This is especially the case where, as here, there is already a safety recall in place which will provide owners and lessees of these vehicles relief in the form of replacement of ball joints and reimbursement for such repairs already made. *See, e.g., Ford Motor Co. v. Magill*, 698 So.2d 1244, 1245 (Fla. Ct. App. 1997)(where the NHTSA "has taken jurisdiction of [the defect] matter and negotiated recall mandates and extended warranties with which Ford Motor Company is complying," the "NHTSA has accorded present owners of the vehicles a remedy to secure a correction of the problem to their vehicle, and Florida courts should defer to [the] NHTSA.") The Court will defer to the NHTSA's investigatory finding of a safety defect, and accordingly, the prospective class in this case could not be permitted by

-26-

the Court to include present owners and lessees of 2000 to 2003 model year, four-wheel drive Dodge Durangos.[8]

However, the Court declines to defer to the NHTSA's decision with respect to 1998 and 1999 model year Dodge Durangos and two-wheel drive 2000 to 2003 model year Dodge Durangos. The NHTSA's investigation into the ball joints is now closed, and as the NHTSA's closing report makes clear, the NHTSA's decision not to pursue a recall of these vehicles does *not* equate to a finding that the NHTSA found no problem or defect in the ball joints of those vehicles. Furthermore, Plaintiff asserted at oral argument on the instant motion that he takes issue with the NHTSA's findings regarding the Durangos not included in the recall, and he is therefore, at a minimum, entitled to proceed to discovery on this issue. *See In re Gen. Motors Type III Door Latch Litigation*, Nos. 98C5836, MDL1266, 2001 WL 103434, at *2 (N.D. Ill. Jan. 31, 2001)(unpublished opinion)(NHTSA report finding no defect does not dispose of plaintiff's claim where question of fact exists about soundness of NHTSA's data collection).

Moreover, in many of the cases relied on by Defendants, the courts were ruling on motions for class certification, and more specifically, found that defect class actions were not "superior" to other remedies, such as petitioning the NHTSA for a defect investigation. *See, e.g., Chin v. Chrysler Corp.*, 182 F.R.D. 448, 464 & n.6 (D.N.J. 1998); *In re Ford Motor Co.*

---

[8] Of course, the Court makes no finding at this time that the certification of *any* class of plaintiffs is appropriate.

*Ignition Switch Prods. Liability Litigation*, 174 F.R.D. 332, 353 (D.N.J. 1997); *In re Bridgestone/Firestone Tires Prods. Liability Litigation*, 288 F.3d 1012, 1019 (7th Cir. 2002); *American Suzuki Motor Corp. v. Super. Ct.*, 37 Cal. App. 4th 1291, 1299-1300 (1995). These cases did not address the issue of primary jurisdiction and are of very little assistance to the Court at this stage in the proceedings. In the handful of cases where the courts discussed and applied the doctrine of primary jurisdiction (or at a minimum, preemption, a related issue), the plaintiffs were requesting a court-ordered recall or retrofit, relief which is clearly within the special competence of the NHTSA. *Coker*, 2004 WL 32676, at *4-5; *Magill*, 698 So.2d at 1245; *Solarz*, 2002 WL 452218, at *3-4; *Lilly v. Ford Motor Co.*, No. 00C7372, 2002 WL 84603, at *4-5 (N.D. Ill. Jan. 22, 2002)(unpublished opinion)(preemption). In contrast, Plaintiff here is seeking damages, a matter within the normal competence of the courts. *Kent v. DaimlerChrysler Corp.*, 200 F. Supp. 2d 1208, 1218-19 (N.D. Cal. 2002)(no NHTSA primary jurisdiction where damage claims in defect class action were "within the conventional experience of judges."); *Mazerolle*, 2002 WL 31367215, at *3 (stay under primary jurisdiction not warranted where plaintiffs' warranty and unfair trade practice damage claims fall "within the traditional fare of the Maine courts"). In sum, at this stage of the proceedings, the Court does not find any basis under the primary jurisdiction doctrine to dismiss the claims of the Plaintiff whose vehicle is not covered by the safety recall.

-28-

**F.      Injury-in-Fact**

Defendants argue that in the event the Court does not dismiss this case in its entirety, the class allegations of Plaintiff's second amended complaint should be dismissed because the putative class of all present and former owners and lessees of model year 1998-2003 Dodge Durangos purports to include individuals whose vehicles' ball joints have never malfunctioned, and who have not sustained any other actual injury due to the ball joints, citing the North Carolina Business Court's recent decision in *Coker*, 2004 WL 32676, at *3-4.  Defendants contend, under *Coker*, that mere allegations of diminished value or loss of resale value are not sufficient to allege actual injury.

As noted above, the Business Court's *Coker* decision was recently affirmed by the North Carolina Court of Appeals.  *Coker v. DaimlerChrysler Corp.*, ___ N.C. App. ___, 617 S.E.2d 306 (2005).  In that decision, the plaintiffs alleged as damages "an amount sufficient to repair and/or install brake shift interlock" ("BSI") on their vehicles.  *Id.* at 313.  None of the plaintiffs had incurred expenses by installing a BSI on their vehicles or had sold their vehicles for a reduced amount.  *Id.*  The Court of Appeals held that the "sole remedy plaintiffs seek is for possible *future* expenses not yet incurred."  *Id.*  The court found that the plaintiffs had "not suffered a 'concrete and particularized' injury in fact that is 'actual and imminent,'" and that "[t]heir claims are too speculative and illusory to show a legal injury in fact."  *Id.* (quoting *Neuse River Found., Inc. v. Smithfield Foods, Inc.*, 155 N.C. App. 110, 114, 574 S.E.2d 48, 52 (2002)).

Applying these principles to the instant case, it is clear that John Bussian, the named Plaintiff, has sufficiently alleged injury-in-fact in that he alleged that after being informed that his ball joints needed immediate replacement by his mechanic, he replaced his ball joints in his 1998 Durango at a cost of $700 in 2003. However, the Court notes that, under North Carolina law and the law of the overwhelming majority of jurisdictions, prospective class members whose ball joints have not manifested any defects and who merely allege that they have suffered diminished value or loss of resale value of their Durangos, will not sufficiently allege actual injury. *Carlson v. Gen. Motors Corp.*, 883 F.2d at 297-98 (4th Cir. 1989); *Briehl v. Gen. Motors Corp.*, 172 F.3d 623, 627-28 (8th Cir. 1999)(noting trend and that courts have been "particularly vigilant in requiring allegations of injury or damages in products liability cases"); *In re Gen. Motors Type III Door Latch Litigation*, 2001 WL 103434, at * 2-5; *In re Air Bag Prods. Liability Litigation*, 7 F. Supp. 2d at 803-04 (noting that even where the alleged defect is life-threatening, "the absence of manifest injury is so fundamental a deficiency . . . that such claims are more appropriately dismissed than preserved."); *Weaver v. Chrysler Corp.*, 172 F.R.D. 96, 99-100 (S.D.N.Y. 1997); *Martin v. Ford Motor Co.*, 914 F. Supp. 1449, 1455 (S.D. Tex. 1996); *Yost v. Gen. Motors Corp.*, 651 F. Supp. 656, 657-58 (D.N.J. 1986); *Green v. Gen. Motors Corp.*, No. A-2831-01T-5, 2003 WL 21730592, at *2-3, 9 (N.J. Super. Ct. July 10, 2003)(unpublished opinion)("We hesitate to rule in a fashion that would require manufacturers to become indemnitors for potential injuries that may never materialize."); *Ziegelmann v. DaimlerChrysler Corp.*, 2002 N.D. 134, 649 N.W.2d 556, 559-

65 (2002); *Frank v. DaimlerChrysler Corp.*, 741 N.Y.S.2d 9, 292 A.D.2d 118, 121-28 (N.Y.

Sup. Ct. 2002); *Ford Motor Co. v. Rice*, 726 So.2d 626, 628-31 (Ala. 1998); *Lee v. Gen.*

*Motors Corp.*, 950 F. Supp. 170, 171-75 (S.D. Miss. 1996).

In response to this pleading insufficiency, the Court opts not to strike, *sua sponte*, the

class allegations of Plaintiff's second amended complaint altogether. Instead, the Court will

provide Plaintiff with an opportunity to file an amended motion for class certification to

conform to the findings in this recommendation. In any such amended motion for class

certification, the scope of the proposed class should be narrowed to only those present and

former owners and lessees of all model year 1998-1999 Dodge Durangos and two-wheel

drive model year 2000-2003 Durangos who have actually suffered actual injury, i.e., sold

their Durangos at a reduced amount; or replaced their Durangos' ball joints; or experienced

property damage because of ball joint failure, either to other components of their Durangos

or to other property.

## IV. Motions to Intervene

Also before the Court are three motions to intervene in this action filed by eight

individuals with claims similar to the named Plaintiff John Bussian (collectively "Proposed

Intervenors"). Defendants oppose the motions primarily on the ground that ruling on a

motion to intervene before a class has been certified is premature and unwarranted.

The Court will allow the motions to intervene pursuant to the "permissive

intervention" principles in Rule 24(b)(2) of the Federal Rules of Civil Procedure. Under that

-31-

rule, permissive intervention is appropriate in circumstances in which (1) the application is timely; (2) the moving party's claim or defense and the main action have a common question of law or fact; and (3) the proposed intervention will not unduly delay or prejudice the adjudication of the original parties' rights." *Capacchione v. Charlotte-Mecklenburg Bd. of Educ.*, 179 F.R.D. 505, 507 (W.D.N.C. 1998)(citing *Hill v. Western Elec. Co.*, 672 F.2d 381, 385-86 (4th Cir. 1982) and 6 James W. Moore *et al.*, *Moore's Fed. Prac.* § 24.10 (3d ed. 1997)). The Court finds that all of these considerations weigh in favor of permitting intervention in this case.

However, the Court notes that none of the Proposed Intervenors' motions or briefs in support indicate if the model year 2000-2003 Durangos they own or lease are two-wheel or four-wheel drive, which would impact whether or not their vehicles are covered by the safety recall. Accordingly, if further discovery reveals that any of the Proposed Intervenors have vehicles that are covered by the NHTSA's investigation and recall, the Court should accede to the primary jurisdiction of the NHTSA and should dismiss their claims.

## V. Conclusion

For the foregoing reasons, **IT IS HEREBY RECOMMENDED** that Defendants' motion to dismiss (Pleading No. 33) be denied as to Plaintiff's claim for breach of express warranties. **IT IS FURTHER RECOMMENDED** that Defendants' motion to dismiss (Pleading No. 33) be granted as to Plaintiff's claims for breach of the implied warranty of merchantability, violation of the Magnuson-Moss Warranty Act, and violation of the North

Carolina Unfair or Deceptive Trade Practices Act, and that these claims be dismissed with prejudice. Finally, **IT IS RECOMMENDED** that the motions to intervene (Pleading Nos. 24, 37, 54) be granted.

**IT IS ORDERED** that Defendants have 45 days from the date of docketing of this order to depose the named Plaintiffs. Within 60 days thereafter, Plaintiff may file a renewed motion for class certification in view of the Court's findings in this recommendation and any order entered therein. Responses to this class certification motion are to follow within 45 days, and replies are then due within 15 days. Brief in support of and in opposition to the motion are permitted to extend to 25 pages. Any reply shall be limited to 10 pages. This schedule supersedes previous schedules set by the Court.

**IT IS FURTHER ORDERED** that Defendants' motion to dismiss (Pleading No. 2) is dismissed as moot.

_____/s/ P. Trevor Sharp_____
United States Magistrate Judge

Date: November 3, 2005